| UNITED STATES DISTRICT COURT | |
|---|---|
| EASTERN DISTRICT OF NEW YORK | NOT FOR PUBLICATION |

UNITED NATIONS INTERNATIONAL
SCHOOL,

        Plaintiff–Counter Defendant,

    – against –                    **MEMORANDUM & ORDER**

UNITED NATIONS INTERNATIONAL         17-CV-4811 (ERK)
SCHOOL STAFF ASSOCIATION,

        Defendant–Counter Claimant.

KORMAN, *J.*:

    Geoffrey Van Kirk was a teacher for twenty-two years at UNIS, a school that serves children of parents affiliated with the United Nations. But after complaints, the school investigated Van Kirk, heard concerning allegations, and fired him. Van Kirk challenged the firing in an arbitration, as was his right under the collective-bargaining agreement between the school and its teachers' union. The arbitrator ordered that Van Kirk be reinstated. Whether or not I would have ruled differently, this order, the result of arbitration, is what the school and the union had bargained for. But the school has refused to reinstate Van Kirk. The union now asks me to enforce the order. The school asks me to vacate it.

## BACKGROUND

    The only issue before me is what I will call a "no-contact instruction," although another instruction, a "photography ban," is also relevant. Although the school does not contest the arbitrator's rulings on other allegations, I mention them as part of the larger story. That begins shortly after the United Nations was founded, when some people affiliated with it established a

nursery school for their children called UNIS—the United Nations International School. By the time of the arbitration, UNIS had grown into an internationally recognized school of more than 1,550 K–12 students. Arbitration Opinion and Award (Dkt. 18-3) at 5. Geoffrey Van Kirk taught eighth-grade English there for twenty-two years. *Id.* He was well respected. *Id.* The arbitrator found that Van Kirk is "dedicated," "work[ed] hard to engage his students," and "sees the beauty in language." *Id.* at 18. But he "does not always pick up on 'social cues'" and "does not always understand the limits of what he can say and do in front of students." *Id.*

Van Kirk had a practice of photographing various goings-on at the school. *Id.* at 5. This included documenting a school trip to Costa Rica in 2015, during which some of Van Kirk's photographs allegedly captured female students wearing bathing suits. *Id.* at 2, 12. Parents complained, and the school's executive director orally told Van Kirk to stop photographing students—the "photography ban." *Id.* at 2, 12. Van Kirk nonetheless again photographed students, at least on United Nations Day in October 2015. *Id.* at 13.

Things soured further later that fall when Van Kirk was in class discussing a New York Times article about alleged sexual misconduct. A student (and the student's parent) would later complain that Van Kirk had referred to the allegations as "the juicy part" of the article. *Id.* at 15; School's Statement of Undisputed Facts (Dkt. 19-5) ¶ 10. This prompted the school to suspend Van Kirk in mid-November until an investigation was done. Award at 2; School's Statement ¶¶ 12–13.

Although Van Kirk had no disciplinary history, the investigation unearthed concerning allegations. (Van Kirk challenged the seriousness of these allegations, although not always the underlying facts.) Award at 6, 8–10. These allegations included that Van Kirk might have exposed

2

himself to some of his male students while in a locker room on the Costa Rica trip. *Id.* at 6, 12 n.1. There was a statement about a "fingering safari" (although Van Kirk claims that he said "finger safari" and did not mean it sexually). *Id.* at 16–17. Several students were uncomfortable with Van Kirk's photography. Pet. to Vacate (Dkt. 1-2) ¶ 26. One almost cried while describing him as "creepy." *Id.* at ¶ 27. Another said that she had "never experienced a teacher" with whom she had "felt so uncomfortable." *Id.*

What happened next is now the crux of the case. After the investigation, on December 4th, 2015, the school's executive director emailed Van Kirk, copying the union, to schedule a meeting on December 9th, at which she apparently planned to fire him. *See* 1st School Decl. Ex. D (Dkt. 18-4); 1st Union Decl. (Dkt. 17-1) Ex. B at 421. She included in her email the sentence "In the interim, please cease all contact with students via Schoology, email, or by any other means"—the "no-contact instruction." 1st School Decl. Ex. D. Yet on December 9th, Van Kirk did use Schoology (an online content-sharing platform) to send a homework assignment on Shakespeare to his students. Pet. to Vacate Ex. C (PDF p. 101). He did this because he wanted to "help [his] students in their English class lessons" and he "was being paid to teach until such time as [he] heard otherwise." 1st Union Decl. Ex. B at 678. The meeting was held the day after that, on December 10th, and the school fired Van Kirk. Award at 2, 7.

The school explained its justifications in a termination notice. *Id.* at 2–4. Under the collective-bargaining agreement ("CBA"), teachers cannot be fired at will, but they can be fired

almost "at any time" for "just cause." CBA (Dkt. 18-2) at §§ 5.4.01, 5.6.00.[1] "Just cause" is defined as certain grave infractions:

- A. Explicit refusal to comply with a rule, regulation or directive of the school.
- B. Gross neglect of duty
- C. Serious incompetence
- D. Serious Misconduct
- E. Breach of contract

*Id.* at § 1.1.35. The notice primarily charged that Van Kirk's discomforting behavior constituted gross neglect of duty, serious incompetence, and serious misconduct. Award at 2–4. The termination notice also charged that Van Kirk had refused to comply with an "unambiguous directive" by continuing to photograph students after the Costa Rica trip despite "specific and direct instructions" not to. *Id.* at 3. In the notice, this was the *only* listed "[e]xplicit refusal to comply with a rule, regulation or directive of the school." *Id.* The notice did not charge that Van Kirk's contact with his students through Schoology was a violation of any directive; indeed, the notice did not mention the Schoology message at all. *Id.* at 2–4.

The union challenged Van Kirk's firing in an arbitration. This remedy is explicitly authorized in the CBA: the "Arbitration" section says that "[a] grievance … may be submitted … to an arbitrator" and that "[t]he award of an arbitrator shall be final and binding upon the school, the [union] and the grievant." CBA at § 14.1.05. The arbitration, which proceeded under the rules

---

[1] The arbitrator read the CBA this way, Award at 12; I do too; and neither party disagrees. There is, however, language in the CBA suggesting that even "just cause" firings are subject to escalating due-process steps. *See* CBA at § 5.6.01.

of the American Arbitration Association, was thorough. There were five days of testimony from eleven witnesses, numerous exhibits, and closing briefs. Award at 1, 11.

Although the hearing focused on the photography ban and the other grounds for termination, it apparently did not focus on the no-contact instruction. This was because of the arbitrator's "general principal … that the employer is bound by the terms of the termination notice." 1st Union Decl. Ex. B at 426. So when the school tried to introduce evidence of the Schoology message—which had not been listed as a ground in the termination notice—the arbitrator rejected it for that reason: "I'm not saying there might not be reason to receive it after further testimony, but at this point it's not received." *Id.* Later, the school tried to introduce the message again, and this time the arbitrator said he would admit it, although still not as a ground to sustain the firing. "I'm going to receive it," he said. "It does not go to the reasons for the termination, but I can see reasons that it might be relevant to this matter. I'm not going to pre-judge it at this point so I'll receive it." *Id.* at 677–78.

At the end of the hearing, the arbitrator asked for briefing "on the question what is a rule, regulation or directive of the school" for purposes of "just cause." *Id.* at 790. Both parties focused their briefing on the photography ban, not the no-contact instruction, which the arbitrator had said he would not consider as a ground for termination. *See* 2d School Decl. Ex. A (Dkt. 19-2) at 29–33, 2d Union Decl. Ex. B (Dkt. 20-3) at 27–29. The union pointed to another use of the word "directive" in the CBA, in a section called "Policy Documents," which says that:

> UNIS shall transmit copies of all regulations, resolutions, directives and policies pertaining to items covered in this *Agreement* to the President or Vice-President of the Staff Association.

2d School Decl. Ex. A at 31 (quoting CBA at § 3.3.01). Based on this section, and reading "directive" in line with "rule" and "regulation," the union argued that a directive was a written "authoritative instrument issued by a high level executive of the School," transmitted to the union, "to guide conduct or procedure" *Id.* at 30–32. Thus the photography ban, which was neither written nor transmitted to the union, was not a directive.[2] The school, in contrast, argued that the photography ban was a directive simply because it was something the executive director had directed Van Kirk to adhere to. 2d Union Decl. Ex. B at 27–29. The school argued that the photography ban was not the kind of directive that needed to be sent to the union in writing under the "Policy Documents" section—"not a School-wide policy change"—but rather "a simple instruction between management and a teacher," although a directive nonetheless. *Id.* at 29.

The arbitrator issued a 21-page opinion. Overall, he found the sexually tinged allegations insufficient to sustain the firing, and concluded that Van Kirk's missteps "were, at heart, teaching issues, not behavioral." Award at 19–20. It was "clear that with some appropriate training, [Van Kirk could] again be an excellent teacher." *Id.* at 20.

On the specific question of "directives," the arbitrator essentially adopted the union's reading. Award at 12–13. He apparently concluded that the oral photography ban was not a "directive of the school" because it was not "a formal written directive transmitted to the" union. *Id.* at 13. In full, he wrote that:

---

[2] In context, this was not a concession that the no-contact instruction *was* a directive, even though it was written and sent to the union.

6

> The first question is whether the [oral photography ban] was a "directive" as defined in the collective bargaining agreement.
> According to the Staff Association, the [oral] directive could not be what is contemplated in Article 1.1.35(A) [which defines "just cause"] since it was [oral]. In support, [the union] points out that the contract also references "directives" in Article 3.3.01, UNIS documents, as follows:
>
> Policy Documents
> UNIS shall transmit copies of all regulations, resolutions, directives and policies pertaining to items covered in this Agreement to the President or Vice-President of the Staff Association.
>
> Reading the two provisions together, it is clear that Article 1.1.35(A) means that the School would have just cause to terminate an employee who has violated a written, formal "rule, regulation or directive of the School." Article 1.1.35(A) does not state a directive of the administration or the Executive Director or management; it refers to a directive of the School. A directive of the School must mean a formal written directive transmitted to the Staff Association in accordance with Article 3.

*Id.*

Then, despite his earlier statements that the Schoology message did not go to the reasons for termination, the arbitrator immediately went on to briefly analyze it, too. He concluded that Van Kirk's violation of the no-contact instruction did "not rise to the level justifying immediate discharge":

> The School also charges that the Grievant violated a specific, written directive not to communicate with any of his students after his suspension, specifically including by way of the School bulletin board, "Schoology." The Grievant did, in fact, communicate with his students by posting a message to his students via Schoology on December 9, 2015—three days after the School expressly forbid him from doing so.
> This can be considered evidence supporting the proposition that he violated a prior School directive or an independent violation of a School instruction. As evidence that he had a pattern of violating School directives, it does not add to the record. As an independent violation of an instruction, it does not rise to the level justifying immediate discharge. The contract does not contemplate suspensions as discipline and only a written warning is warranted.

7

*Id.* at 13–14. This discussion of the no-contact instruction could be clearer. But it is easiest to understand in light of the arbitrator's statements that the Schoology message "might be relevant" for reasons other than termination and that that he would not "pre-judge it." 1st Union Decl. Ex. B at 677–78. I read the discussion as first considering why the Schoology message might be relevant even if not as a ground for firing—as evidence that he violated the photography ban, a sort of limited use akin to that discussed in Federal Rule of Evidence 404(b). Then, despite the arbitrator's earlier ruling that he would limit himself to the grounds in the termination notice, the opinion almost offhandedly considers the no-contact violation on the merits, stating that it could not justify the firing.

In the end, the arbitrator rejected all the school's grounds and ordered Van Kirk reinstated with back pay. Award at 20–21. The school has effectively "appealed" the order to me, and, in the meantime, it has refused to reinstate Van Kirk. 1st Union Decl. ¶ 6. In response, the union asks me to confirm the order. Both parties have cross-moved for summary judgment on the paper record from the arbitration.

## ANALYSIS

The only basis on which the school challenges the arbitration is the analysis of the no-contact instruction. School Mem. (Dkt. 16-2) at 1–3. Given the arbitrator's announced ruling that he would consider only grounds listed in the termination notice, the Schoology message appears to have been a minor point in the hearing, worth only a few lines in the arbitrator's opinion—two sentences of analysis in 21 pages. Award at 13–14. Nonetheless, according to the school, this is the hook: the no-contact instruction was a "directive of the school" within the meaning of the CBA, and "[e]xplicit refusal to comply with … a directive of the school" is "just

8

cause" for termination. CBA at § 1.1.35. The arbitrator therefore "unquestionably overstepped his authority" by determining that Van Kirk's violation of this directive did not give the school "just cause" to fire him. School Mem. at 1. Phrased legally, the argument is that the order exceeded the arbitrator's powers, subjecting it to vacatur. *See Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 536–37 (2d Cir. 2016). And the school is right about the rule broadly: "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

A district court's ability to vacate an arbitration order, however, is "very limited." *NFL*, 820 F.3d at 536 (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam)). Indeed, I must confirm the award if it is "barely colorable" as the product of contract interpretation. *NFL*, 820 F.3d at 539 (quoting *In re Andros Compania Maritima, S.A.*, 579 F.2d 691, 704 (2d Cir. 1978)). "A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award." *United Steelworkers*, 363 U.S. at 598.[3]

Here there is at least a "barely colorable" justification for the two sentences on the merits of the Schoology message. Immediately before discussing the no-contact instruction, the

---

[3] Because this case deals with a collective-bargaining agreement, I have considered it primarily under the Labor Management Relations Act, 29 U.S.C. § 141 *et seq. See NFL*, 820 F.3d at 532, 536. The question whether similar law under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, also applies is somewhat thorny. *See Local Union No. 1 of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipe Fitting Indus. of the U.S. & Canada v. Bass*, 2015 WL 1402884, at *4–6. (E.D.N.Y. Mar. 25, 2015) (R. & R.). My analysis would be materially the same under the Arbitration Act.

arbitrator analyzed whether a different instruction, the photography ban, was a "directive of the school" for purposes of "just cause." Award at 13. In this analysis, the arbitrator attempted to give meaning to the undefined term "directive" by examining how else it was used in the CBA. *Id.* This is a mode of contract interpretation. *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 167–73 (2012) ("The text must be construed as a whole."). The arbitrator found another use of "directive" in the "Policy Documents" section, which says that "UNIS shall transmit copies of all regulations, resolutions, directives and policies pertaining to items covered in this Agreement to the President or Vice-President of the Staff Association." Award at 13 (quoting CBA at § 3.3.01). Based on this, the arbitrator determined that, for purposes of "just cause," a "directive" must be "a formal written directive transmitted to the Staff Association." *Id.* Although the arbitrator did not say so explicitly, "formal" no doubt comes from the arbitrator's acceptance of one of the union's post-briefing arguments, that "directives" should be read against nearby terms like "regulations." *See* 2d Union Decl. Ex. A at 30. This is the *noscitur a sociis* canon—contract interpretation again. *See Reading Law* at 195 ("Associated words bear on one another's meaning."). The arbitrator's requirement that the directive be "written" obviously comes from the words "Documents" and "copies." Award at 13. Based on this contract interpretation, the arbitrator concluded that the oral photography ban was not a "directive of the school."

Immediately thereafter, the arbitrator considered the no-contact instruction. Without explicit analysis, he wrote that Van Kirk's sending a message through Schoology did "not rise to the level justifying immediate discharge." Award at 13–14. Was this a personal opinion rather than contract analysis, as the school claims? School Mem. at 12. That's not impossible. But it is at least barely colorable that the arbitrator was applying a definition—"formal written directive"—

10

that he had worked out just two paragraphs earlier. *Cf. United States v. Rosen*, 409 F.3d 535, 546–48 (2d Cir. 2005) (interpreting statement in district court's opinion in light of other analyses in the opinion); *Lattimer–Stevens Co. v. United Steelworkers of Am., AFL–CIO, Dist. 27, Sub-Dist. 5*, 913 F.2d 1166, 1170 (6th Cir. 1990) (refusing to vacate an opinion with an erroneous phrase because "a fair reading of the arbitrator's opinion and award as a whole … show[ed] that the arbitrator [determined a CBA's meaning] only after he considered the language of the agreement and the conflicting positions of the parties"). After all, it is not unreasonable to think that the following email is not a "formal written directive," not a "policy document" akin to a "regulation" or "resolution":

> Dear Geoff:
> I write to let you know that we are likely to be ready to meet with you next Wednesday 12/9, and I'd like to propose 9.30 am in my office. I'll confirm this date and time early next week.
> In the interim, please cease all contact with students via Schoology, email, or by any other means.
> Thank you,
> Jane

1st School Decl. Ex. D (Dkt. 18-4).[4] Thus, when the arbitrator wrote that "[a]s an independent violation of an instruction, it does not rise to the level justifying immediate discharge," he could have meant that the violation of the instruction "did not rise to the level" of those things providing "just cause" for immediate discharge—gross neglect of duty, serious incompetence, serious misconduct, breach of contract, or explicit refusal to comply with a "directive," as he construed the term. Of course this is not the only reading, but, again, "[a] mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have

---

[4] The union does not dispute that Van Kirk violated this instruction. But one could perhaps read "interim" to mean the period until 9:30 AM on Wednesday, December 9, or the period until "early next week" when the executive director would confirm the time of the meeting. If so, Van Kirk's Schoology message, sent on the evening of December 9, may not have violated the instruction.

11

exceeded his authority, is not a reason for refusing to enforce the award." *United Steelworkers*, 363 U.S. at 598.

Moreover, as the Second Circuit has stated, even if there were no "plausible reading free of error, we would confirm the award if we independently found legal grounds to do so." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 392 (2d Cir. 2003). For reasons similar to the arbitrator's, I would not deem the no-contact instruction a directive. As part of the school's argument that the photography ban was a directive, it described the ban as "a simple instruction between management and a teacher" rather than "a School-wide policy change." 2d Union Decl. Ex. B at 29. These descriptions equally apply to the no-contact instruction. Yet "just cause" is defined as including "[e]xplicit refusal to comply with a rule, regulation or directive of the school." This joining of directives with rules and regulations suggests that directives do refer to "School-wide policy change[s]" rather than "simple instruction[s]" to an individual teacher. *See Reading Law* at 199–201 (explaining that under the *ejusdem generis* canon, a catch-all phrase—which the school effectively treats "directives" as—is limited to the scope of previously listed elements). The "Policy Documents" section, on which the arbitrator relied, also supports this reading. It lists directives among "regulations," "resolutions," and "policies," and requires that they be transmitted to the union rather than one individual teacher.

Indeed the school's reading substantially undermines an entire section of the CBA. *Cf. Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect."). In the school's reading, every "simple instruction between management and a teacher" is a directive, even an

12

oral instruction not to photograph students. If so, any explicit refusal to comply with any instruction would be grounds for immediate termination, no matter how minor the refusal or unimportant the instruction. Yet normally the CBA *prohibits* immediate dismissal. CBA at § 5.6.00. Instead, the CBA has a "Disciplinary Procedures" section that provides for "Due process steps." *Id.* at § 5.6.01. Termination can happen only after two written reprimands or three written warnings within a certain time period. *Id.* at § 5.6.04. "Just cause" firings are the exception, not the rule. But a reading in which explicit refusal to comply with *any* simple instruction from management justified immediate firing would significantly weaken the CBA's due-process steps. That reading is not plausible.

My reading of the order also renders inapplicable the cases the school deems analogous. In those cases, arbitrators found that employees could have been fired for just cause, found that there *had been* facts establishing just cause, and ordered reinstatement anyway. *See 187 Concourse Assocs. v. Fishman*, 2003 WL 22966311, at *2–3 (S.D.N.Y. Dec. 16, 2003), *aff'd*, 399 F.3d 524 (2d Cir. 2005) (per curiam); *Local 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Sotheby's, Inc.*, 665 F. Supp. 1089, 1093–94 (S.D.N.Y. 1987). Those orders were properly vacated. In contrast, the arbitrator here (it can be barely colorably argued) found that the no-contact instruction was not a "directive," and, therefore, that there was not "just cause." Award at 13–14. That is not refusing to enforce a legal syllogism; it is rejecting the minor premise.

# CONCLUSION

In terminating Van Kirk, the school wrote of the importance of school safety:

> Parents trust that their children are safe while they are in school, and that all individuals who are responsible for their care throughout the school day maintain a safe and secure environment for them. This trust is established in and out of the classroom by exercising professional judgment, establishing appropriate boundaries, and demonstrating the ability to have constructive relationships with students.

Award at 4. On the record as I see it, the school did what it deemed necessary to resolve parents' complaints about the well-being of their children. I cannot fault the intent, and I sympathize with the school's position. But federal law signs off on arbitration awards in all but the most extreme circumstances. Under current law, the only question is whether a few sentences that were not even the focus of the arbitration had a "barely colorable justification." They did. There is no genuine dispute that the award drew its essence from the CBA. *See NFL*, 820 F.3d at 537; *cf. id.* at 545 n.13, 548 n.16. The union is therefore entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

The school's motion for summary judgment is denied. The union's cross-motion for summary judgment is granted.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York
July 13, 2018

Edward R. Korman
United States District Judge